**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

FILED

May 30 2012, 9:11 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**LEANNA WEISSMANN**
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**MATTHEW K. HAGENBUSH**
DCS, Dearborn County Office
Lawrenceburg, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF J.R.: | ) ) ) | |
| K.C., | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) | No. 15A04-1110-JT-587 |
| | ) | |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

APPEAL FROM THE DEARBORN CIRCUIT COURT
The Honorable James D. Humphrey, Judge
Cause No. 15C01-1102-JT-9

**May 30, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

K.C. (Mother) appeals the involuntary termination of her parental rights to her child, J.R. Mother challenges the sufficiency of the evidence supporting the trial court's termination order.

We affirm.

Mother is the biological mother of J.R., born in October 2008.[1] The facts most favorable to the trial court's judgment reveal that J.R. was born testing positive for opiates. Consequently, the local Dearborn County office of the Indiana Department of Child Services (DCS) took J.R. into emergency protective custody and initiated child-in-need-of-services (CHINS) proceedings. After successfully completing court-ordered reunification services and petitioning the trial court for custody of J.R., this CHINS case was closed in June 2010 with the successful reunification of J.R. and Father. During this initial case, however, Mother did not participate in any reunification services through DCS because she was arrested approximately one week after J.R.'s birth on theft and drug-related charges.

Shortly after J.R. and Father were reunified, Mother was released from incarceration and returned to the family home. On July 9, 2010, DCS received a referral alleging Father had been observed using heroin in the presence of J.R. and with Mother's knowledge. Several days later, DCS substantiated the allegations of drug use by Father, removed J.R. from the family home, and filed a new CHINS petition.

Both parents admitted to the allegations in the second CHINS petition, and the child

---

[1] The parental rights of J.R.'s biological father, C.R. (Father), were involuntarily terminated by the trial court in its October 2011 termination order. Father did not appear for the termination hearing and does not participate in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Mother's appeal.

was so adjudicated. Following a dispositional hearing in November 2010, the trial court issued an order formally removing J.R. from both parents' care and custody. The court's dispositional order further directed the parents to successfully complete a variety of tasks and services designed to facilitate reunification of the family. Among other things, Mother was ordered to (1) refrain from the use of all illegal substances, (2) submit to random drug screens, (3) actively participate in complete home-based counseling services and be able to demonstrate positive changes as a result of said participation, (4) maintain a stable legal source of income, (5) obtain and maintain a safe and stable home environment, and (6) exercise regular visitation with J.R. Mother was later referred for an Intensive Out-Patient (IOP) drug rehabilitation program, as well as individual counseling.

Although Mother was generally cooperative with service providers during sessions, her participation in court-ordered reunification services was sporadic and ultimately unsuccessful. During visits with J.R., Mother had trouble engaging in activities and bonding with J.R. As a result, Mother would become frustrated, "give up," and fail to show for several subsequently scheduled visits, only to return later. *Transcript* at 28. Mother also refused to submit to several requests for drug screens, tested positive for alcohol in December 2010, and tested positive for opiates in February 2011. As a result, Mother's probation officer filed probation violation charges in her criminal case. After eluding arrest for several weeks in December 2010 and January 2011, Mother turned herself in to authorities. Mother's probation was revoked in February 2011, and she remained incarcerated for the duration of the CHINS and termination cases.

Meanwhile, on February 25, 2011, DCS filed a petition seeking the involuntary

3

termination of Mother's parental rights to J.R. A fact-finding hearing on the termination petition was held in June 2011. During the termination hearing, DCS presented significant evidence establishing that Mother had failed to complete a majority of the court-ordered reunification services, including an IOP and home-based counseling. Mother also remained incarcerated on the probation violation, with an earliest possible release date in February 2012, and had new pending charges for theft and burglary arising from an incident that had occurred in December 2010. In addition, DCS presented evidence that J.R. was happy and thriving in relative foster care with the only family he had ever known.

At the conclusion of the termination hearing, the trial court took the matter under advisement. On October 17, 2012, the trial court entered its judgment terminating Mother's parental rights to J.R. Mother now appeals.

Initially, we note that when reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the trial court's decision, we must affirm. *Id.*

Here, the trial court made detailed findings in its order terminating Mother's parental rights. Where the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839

4

N.E.2d 143 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the trial court's conclusions or the conclusions do not support the judgment thereon. *Quillen v. Quillen*, 671 N.E.2d 98.

The traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144 (Ind. Ct. App. 2008). In addition, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832 (Ind. Ct. App. 2001).

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

    (B)    that one (1) of the following is true:

        (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

        (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

                   * * *

    (C)    that termination is in the best interests of the child . . . .

Ind. Code Ann. § 31-35-2-4(b)(2) (West, Westlaw through legislation effective March 14, 2012).[2] The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code Ann. § 31-37-14-2 (West, Westlaw through legislation effective March 14, 2012)). If the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. I.C. § 31-35-2-8 (West, Westlaw through legislation effective March 14, 2012). Mother challenges the sufficiency of the evidence supporting the trial court's findings as to subsections (b)(2)(B) & (C) of the termination statute cited above.[3] *See* I.C. § 31-35-2-4(b)(2).

At the outset, we note that DCS needed to establish only one of the requirements of subsection (b)(2)(B) by clear and convincing evidence before the trial court could terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63 (Ind. Ct. App. 2003). Here, the trial court found DCS presented sufficient evidence to satisfy the first two subsections of (b)(2)(B) of the termination statute. *See* I.C. § 31-35-2-4(b)(2)(B)(i) & (ii). Because we find it dispositive under the facts of this particular case, we shall consider only whether clear and convincing evidence supports the trial court's findings regarding subsection (b)(2)(B)(i), namely, whether there is a reasonable probability the conditions resulting in J.R.'s removal or continued

---

[2] We observe that Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012). The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

[3] Mother does not challenge the sufficiency of the evidence supporting the trial court's findings regarding the remaining elements of Indiana's termination statute, including whether the child was removed from her care for the requisite amount of time, and whether there is a satisfactory plan for the future care and treatment of the child. *See* I.C. §§ 31-35-2-4(b)(2)(A) and (D). Mother has therefore waived appellate review of these issues. *See Davis v. State*, 835 N.E.2d 1102 (Ind. Ct. App. 2005) (concluding that failure to present a cogent argument or citation to authority constitutes waiver of issue for appellate review), *trans. denied*.

placement outside Mother's care will not be remedied.

In making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *In re M.M.*, 733 N.E.2d 6 (Ind. Ct. App. 2000). Similarly, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244 (Ind. Ct. App. 2002), *trans. denied*. The trial court may also consider the services offered to the parent by a county office of the Indiana Department of Child Services and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.* Finally, a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287 (Ind. Ct. App. 2002).

Here, in finding there is a reasonable probability that the conditions resulting in the J.R.'s removal and/or continued placement outside of Mother's care will not be remedied, the trial court made detailed findings regarding Mother's unresolved substance-abuse issues and lack of progress in improving her ability to care for J.R. Specifically, the court's findings detailed Mother's significant periods of incarceration throughout a majority of the underlying proceedings, as well as her additional pending criminal charges at the time of the termination

7

hearing. The court also noted Mother's failure to complete an IOP or any other substance-abuse program, her sometimes "outwardly hostile" attitude toward services providers during the CHINS case, and her admission during the termination hearing that she was currently unable to care for J.R. due to her incarceration. *Appellant's Appendix* at 140. The trial court thereafter concluded:

> DCS has established by clear and convincing evidence that the reasons for continued placement outside the home will not be remedied . . . . [The court's findings] establish [M]other's parenting skill deficiencies, the poor decision making [M]other used in using alcohol and drugs while under order of this Court to refrain from the use of both and other criminal issues, [M]other's own substance abuse issues, and [M]other's lack of continual, lasting progress in the services given to her. Mother's lack of involvement in the first CHINS case on the child was due to her own incarceration, and she does not appear to have progressed substantially from her position at that time.

*Id.* at 142-143. Our review of the record leaves us convinced us that these findings and conclusions are supported by abundant evidence.

During the termination hearing in June 2011, former DCS case worker Tina Kern and court-appointed special advocate (CASA) Jill Rhodes both testified that Mother had failed to adequately address her substance-abuse issues and parenting deficiencies such that J.R. could be safely returned to Mother's care. When asked to describe Mother's participation in reunification services during the CHINS case, Kern answered, "She had her good days and bad days." *Transcript* at 19. Kern further confirmed that although Mother did complete parenting classes, Mother failed to complete home-based services and substance abuse counseling, tested positive for alcohol in December 2010 and for opiates in February 2011, and spent a majority of the underlying proceedings incarcerated on multiple theft and drug-

8

related offenses that occurred during the pendency of this case. Mother also remained incarcerated at the time of the termination hearing, with an earliest possible release date in February 2012. Moreover, due to the pending class D felony theft and class C felony burglary charges, Mother was facing the possibility of several years more incarceration if found guilty.

Mother's own testimony lends further support to the trial court's findings. During the termination hearing, Mother informed the court that she had struggled with substance abuse since September 2008 and had been convicted of several drug-related criminal charges since she started using drugs. Mother also confirmed that she had been sober for only four months while incarcerated, had failed to complete an IOP or any other substance-abuse program by the time of the termination hearing, and has three older children that were no longer in her care due to her drug use.[4]

This court has repeatedly recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *See, e.g., Castro v. State Office of Family & Children*, 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied*. Moreover, where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Here, Mother has demonstrated a persistent unwillingness and/or inability to take the actions necessary to show she is capable of overcoming her substance addiction, refraining

from criminal activity, and providing J.R. with the safe, stable, and drug-free home environment he needs. Mother's arguments on appeal, including her arguments that she has "availed herself to drug treatment programs while she's been in the prison system" and that her "recent violation appears to be minimal" amount to an impermissible invitation to reweigh the evidence. *Appellant's Brief* at 9; *See, e.g., D.D.*, 804 N.E.2d 258.

We next consider Mother's assertion that DCS failed to prove termination of her parental rights is in J.R.'s best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and look to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185 (Ind. Ct. App. 2003). In so doing, the trial court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* Moreover, we have previously held that the recommendations of both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *See In re M.M.*, 733 N.E.2d 6.

In addition to the findings previously discussed, the trial court made several additional pertinent findings in determining that termination of Mother's parental rights is in J.R.'s best interests. Specifically, the trial court found that J.R. is thriving in the care of his relative

---

[4] Although it appears Mother's three older children were no longer under Mother's physical care prior to the initiation of the underlying proceedings, the record is unclear as to whether Mother's parental rights to these

foster parents, that J.R. has spent "more time placed with the [foster parents] than he ever has with his natural parents," and that the foster parents have indicated a willingness to adopt J.R. *Appellant's Appendix* at 141. In addition, the trial court's findings acknowledged the respective testimony of case manager Kern and CASA Rhodes that they believed termination of Mother's parental rights would be in J.R.'s best interests based on J.R.'s need for "stable, sober, and appropriate caregivers." *Id.* The court's findings further cited Kern's and Rhodes's concerns regarding Mother's ongoing criminal activities and J.R.'s "growing need for permanency given the timeline of the case." *Id.* These findings, too, are supported by the evidence.

In recommending termination of Mother's parental rights to J.R., Kern testified that J.R. appeared "happy" and "fit in very well" with his relative foster family. *Transcript* at 24-25. Kern further testified that J.R. had a "very difficult time" rebuilding the bond with Mother after he was removed from the family home the second time and that she believed "trying to go back again a third time would be very, very harmful for hi[m] and difficult." *Id.* at 24. Similarly, CASA Rhodes confirmed that J.R. was "well cared for" in his current foster home and that the home was "stable." *Id.* at 32. When asked why she believed termination of Mother's parental rights was in J.R.'s best interests, CASA Rhodes replied, "Mostly, I think because [J.R.'s] been in the placement where he is, as long as he's been [in foster care]. . . . [T]here's no likely future for him with [Mother] in jail, with his father not participating in his life and not keeping his record clean, and furthermore, for small children, time is very

other children remain legally intact.

11

important." *Id.* Rhodes further explained that children are more "sensitive" to time than adults, that a single day "is an eternity to a small child," and that J.R., who has already spent "many months" with his foster family, is "too old to go to someone he doesn't even know" now, especially in light of the additional time it will take for Mother to be released from incarceration, participate in services, and prove she can maintain her sobriety outside of incarceration, notwithstanding any additional jail time she may receive if convicted of the current pending charges. *Id.* at 32-35.

Based on the totality of the evidence, including Mother's current incarceration, unresolved substance-abuse issues, history of criminal activities, pending criminal charges, and current inability to demonstrate she is capable of providing J.R. a safe and stable home environment, coupled with the testimony from Kern and Rhodes recommending termination of the parent-child relationship, we conclude that clear and convincing evidence supports the trial court's determination that termination of Mother's parental rights is in J.R.'s best interests.

This Court will reverse a termination of parental rights "only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.,* 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *Egly v. Blackford Cnty. Dep't of Public Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Judgment affirmed.

MAY, J., and BARNES, J., concur.